JEROME MIRZA & ASSOCIATES,
LTD., an Illinois corporation,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 88–2774.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1989.

Decided Aug. 10, 1989.

Rehearing and Rehearing En Banc
Denied Oct. 25, 1989.

Dean B. Rhoads and Edward F. Sutkowski, Sutkowski & Washkuhn, Peoria, Ill., for Jerome Mirza & Associates, Ltd., plaintiff-appellant.

Jeffrey N. Kaplan, Dept. of Justice, Tax Div., Washington, D.C., John A. Mehlick, Asst. U.S. Atty., Office of the U.S. Atty., Springfield, Ill., Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., and Jonathan S. Cohen, and Michael Roach, Dept. of Justice, Tax Div., Appellate Section, Washington, D.C., for the U.S.

Before COFFEY, FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Jerome Mirza & Associates appeals from a district court decision dismissing its claim for a refund of federal income taxes under 28 U.S.C. § 1346(a)(1). For the reasons discussed below, we affirm.

I.

The taxpayer Jerome Mirza & Associates is a professional corporation engaged in the business of providing legal services. In 1980, the taxpayer established a pension plan to provide pension benefits for two of its employees, Jerome Mirza and David Dorris. Under the terms of the plan, which was designed to conform to the requirements of §§ 401 and 501 of the Internal Revenue Code, each participant accrued a benefit equal to 30% of his compensation for 1980 plus 5% of his compensation for each of the next three years of participation, reduced by the amount necessary to fund social security benefits. This accrued benefit was payable in annual installments on the date the participant reached 55 years of age and completed ten years of participation in the plan.[1] In 1980, Jerome Mirza was 43 years of age and earned $275,000 while Dorris was 33 years of age

---

1. The plan also provided for a lump sum payment of the accrued benefit if the participant retired, became disabled, or died prior to reaching age 55.

and earned $27,000. Consequently, under the terms of the plan, Mirza accrued a benefit of $80,927 payable annually for life at age 55 while Dorris accrued an annual benefit of $1,215. At the time that the plan was adopted, Mirza, who was the corporation's sole shareholder, had been employed by the taxpayer for seven years and Dorris had been employed by the taxpayer for five years.

In order to determine the amount of contributions necessary to adequately fund the benefits accrued under the plan, the taxpayer hired enrolled actuary Joseph Beres. Beres chose the unit credit cost method, an accepted actuarial technique, in making his assumptions and determined that a 5% annual return on investment was an appropriate assumption. Employing this figure, Beres calculated the present value of the future benefits under the plan as $625,925. Beres informed the taxpayer that this sum represented the "normal cost" of the plan and was immediately deductible under 26 U.S.C. § 404(a)(1)(A)(iii).

The taxpayer followed Beres' advice and deducted the entire amount from its federal income taxes for 1980. This deduction created a loss for 1980 which the taxpayer carried back for several years and ultimately resulted in a refund of $235,731. The Commissioner, however, audited the taxpayer's 1980 return and substantially reduced the allowable deduction. Initially, the Commissioner determined that the actuary's 5% interest rate assumption was not reasonable within the meaning of 26 U.S.C. § 412(c)(3) in view of the abnormally high interest rates prevalent in 1980 and substituted its own figure of 8%. Accordingly, the Commissioner reduced the single sum present value of the accrued benefits under the plan from $625,925 to $442,010. In addition, the Commissioner apportioned this amount between the cost attributable to service in 1980 (which he deemed to be the normal cost of the plan) and that attributable to the participant's past service (which under § 404(a)(1)(A)(iii) had to be amortized over a ten year period). This allocation reduced the taxpayer's deduction in 1980 to $115,953.71 which in turn increased the taxpayer's tax liability by $227,415. The taxpayer paid this amount plus interest of $193,950 and sued for a refund under 28 U.S.C. § 1346(a)(1).

The district court conducted a hearing on the question of the reasonableness of the actuary's assumptions, concluded that Beres' 5% interest assumption was not reasonable based on the experience and characteristics of the taxpayer's plan, and upheld the Commissioner's calculation of the present value of the benefits provided by the plan as $442,010. In addition, the district court, on cross motions for summary judgment, determined that under § 404(a)(1)(A)(iii) this figure had to be allocated between the cost of benefits attributable to service in 1980 and the cost of benefits attributable to service in prior years. Accordingly, the district court upheld the Commissioner's determinations in all respects. 692 F.Supp. 918. The taxpayer appeals from this decision.

## II.

■ The initial question on appeal is whether the district court correctly concluded that the actuary's 5% interest rate assumption was not reasonable. The issue of the reasonableness of an actuary's assumptions under § 412 is a question of fact and the district court's decision will not be reversed unless clearly erroneous. *See Board of Trustees, Michigan United Food and Commercial Workers Unions v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987). Under the clearly erroneous standard, an appellate court will not disturb a district court's finding unless it is left with the firm conviction that a mistake has been committed. *Shore v. Dandurand*, 875 F.2d 656, 659 n. 9 (7th Cir.1989).

In our view, the district court's findings were not clearly erroneous. At trial, there was conflicting expert testimony on the question of reasonableness. Plaintiffs' witnesses concluded that because the plan's principal beneficiary who was 43 years of age at the time the plan was instituted intended to retire at age 55, the relevant time period for making the actuarial assumptions was twelve years and testified

that pension plans earned approximately 5% on their investments in the twelve-year period 1968–1980. In addition, these witnesses testified that actuaries, fearing personal liability if the plan ultimately proves to be inadequately funded, are generally very conservative in making their assumptions.

Not surprisingly, the government's witnesses took a different view of the reasonableness of the actuary's assumptions. The government's witnesses noted that under § 412(c)(3), the reasonableness of an actuary's assumptions must be evaluated in light of the plan's experience and reasonable expectations and testified that an interest rate assumption of 5% was simply not reasonable when these factors were taken into account. In particular the government's witnesses testified that at the time the valuation was made, interest rates on certificates of deposit ranged between 11.65% and 15.75% and were approximately 12% for long-term (*i.e.*, 10 and 20 year) certificates. In addition, the government's witnesses noted that at the time Beres made his calculations the plan had already invested $300,000 in short-term certificates of deposit and contended that this information should have alerted the actuary to the type of investment the plan preferred *i.e.*, conservative investments. Finally, the government's witnesses emphasized that under the terms of the plan most of the accrued benefits were to be funded within four years of the actuary's valuation. Given these facts, the government's witnesses testified that an interest rate assumption of 7–10% would have been reasonable.

As noted above, we will not reverse the district court's decision unless we are left with the firm conviction that an error has been committed. On the facts of this case we are unable to reach this conclusion. In view of the structure of the funding of the plan and its history of investments there is abundant evidence in the record supporting the government's position that an 8% rate of interest was appropriate. Conversely, there was ample evidence adduced at trial indicating that the actuary's 5% interest rate assumption was not reasonable given the peculiarities of the taxpayer's plan. In particular, the actuary's reliance on the long-term returns on investments by large-scale pension plans was unsound given the fact that the taxpayer's plan was very small and would be fully funded over a very short period. Moreover, by relying on information which included substantial investments in the stock market, the actuary ignored the experience of the taxpayer's plan which had shown no inclination to make these types of investments. Given these facts, we are unable to conclude that the district court's decision was clearly erroneous.

### III.

■ Having determined that the government properly reduced the taxpayer's allowable deduction from $625,925 to $442,-010, we must next decide whether the taxpayer could deduct this entire amount in 1980 or was required to spread the deduction over several years. The resolution of this issue depends upon our construction of § 404(a)(1)(A)(iii) of the Internal Revenue Code as it existed in 1980 in light of other relevant provisions and regulations. In that year, § 404(a)(1)(A)(iii) granted employers a deduction for contributions to a qualified pension plan in an amount equal to the normal cost of the plan, as determined under regulations prescribed by the Secretary, plus if past service or other supplementary pension or annuity credits are provided by the plan, an amount necessary to amortize such credits in equal annual payments (until fully amortized) over 10 years.

The dispute in this case centers on the meaning of the term "normal cost." The taxpayer asserts that normal cost is defined as "an amount equal to the present value of benefits accruing under the method for a particular plan year," Treas.Reg. § 1.412(c)(3)–1(b)(2)(ii) (1981), and argues that since the plan was structured to provide benefits based on compensation earned during 1980, the entire amount of these benefits accrued during that year. In addition, the taxpayer argues that while subsequent developments have eliminated

the possibility of employers taking such a large deduction in the first year of a plan's existence,[2] nothing in either the Internal Revenue Code or published guidance available in 1980 cast doubt upon its method. At its most elemental level, therefore, the taxpayer's argument is that it took advantage of a loophole in the federal tax laws in 1980.

The government does not dispute that the normal cost of a plan is defined as the cost of benefits accruing during the particular year. Rather, the government argues that the benefits provided by the taxpayer's plan did not all accrue in 1980. In the government's view, § 404(a)(1)(A)(iii) should not be read in isolation but must be interpreted in conjunction with § 415(b), the provision that limits the annual benefits payable to a participant in a qualified plan. In 1980, § 415(b) limited the annual benefit payable to a highly compensated employee like Jerome Mirza to the following amount: $110,625 × employee's years of service divided by ten.[3] Thus, a highly compensated employee without prior service was limited to a maximum annual benefit of $11,062. As noted above the taxpayer's plan provided Jerome Mirza with an annual benefit of over $80,000, a benefit that was only possible due to Mirza's seven years of service to the taxpayer. The government argues that in view of the fact that the level of benefits paid by the plan is attributable in large measure to Mirza's service in years prior to 1980, it was not reasonable for the taxpayer to attribute the cost of funding those benefits solely to 1980. Rather, the government asserts that the taxpayer was required to take his past service into account in taking a deduction under § 404(a)(1)(A)(iii) by allocating a substantial portion of the cost of funding the plan's benefits to past service credits. This allocation in turn would require the taxpayer

to deduct the cost of funding these past service credits over a ten year period.

The guiding principle in this case is that deductions are extensions of legislative grace and not matters of right. *Colonial Savings Association and Subsidiaries v. Commissioner*, 854 F.2d 1001, 1006 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989). Accordingly, "a deduction from income for tax purposes may be taken only when support for it can be found in the language of a statute, appurtenant regulations, or legislative history. *Hintz v. Commissioner*, 712 F.2d 281, 284 (7th Cir.1983). The taxpayer bears the burden of proving that it is entitled to take a deduction, and the Commissioner's determinations are presumed to be correct. *Colonial Savings Association*, 854 F.2d at 1006.

In our view, the taxpayer has failed to establish that it was entitled to deduct the entire cost of funding the pension plan's benefits in 1980. At the outset, we note that the taxpayer's method of allocating all the costs of funding benefits to normal cost is not supported by any authority. The taxpayer has cited no legislative history and we have been unable to find any that approves its method of deducting the entire cost of funding pension benefits in the first year of a plan's existence. Further, there are no Treasury regulations or revenue rulings that support the taxpayer's position. Most importantly, by upholding the taxpayer's deduction we would effectively eliminate the last part of § 404(a)(1)(A)(iii) which provided for the amortization of the cost of past service credits. It is simply inconceivable that Congress would take pains to provide for the amortization of past service credits but intended to allow taxpayers to circumvent this requirement by the device of structuring their plans to accrue benefits in a single year.[4] More-

---

**2.** In 1985, the Service issued Revenue Ruling 85–131 which explicitly held that under the unit credit cost method the costs of benefits must be apportioned between service in the present year and service in past years.

**3.** In 1980, § 415(b) restricted the maximum annual benefit payable to a participant in a qualified plan to the lesser of $110,625 or the partici-

pant's average compensation over a three year period.

**4.** The taxpayer places substantial reliance on the fact that Congress permitted employers to pay benefits based primarily on income earned during the early years of a plan's existence ("front-loading") while it explicitly prohibited the payment of benefits based on service in the later

over it is equally implausible that Congress intended to allow taxpayers to derive benefits from past service under § 415 while ignoring this past service when it would not be beneficial.

In sum, we find that the taxpayer has not met its burden of demonstrating that it was entitled to deduct the entire cost of funding the participants' pension benefits in 1980. Accordingly, we affirm the Commissioner's allocation of the costs of funding the pension plan between costs attributable to service in 1980 and costs attributable to service in prior years.

### IV.

For all the foregoing reasons the judgment of the district court is affirmed.

years of a plan's existence. That reliance is misplaced. The issue in this case is not whether the plan qualified under §§ 401 and 501 but rather when the deductions may be taken. The fact that Congress authorized a particular structure for a plan does not mean that it authorized an immediate deduction for the entire cost of that plan.